# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MIYKAL GATES, | No. 55311-2-II |
| Appellant, | |
| v. | |
| DEPARTMENT OF SOCIAL AND HEALTH SERVICES | UNPUBLISHED OPINION |

GLASGOW, J.—SM was admitted to Fidalgo Care Center, a skilled nursing facility, after open-heart surgery. Miykal Gates was the Director of Nursing Services at Fidalgo and was ultimately responsible for ensuring that doctor's orders were followed. During SM's stay at Fidalgo, nursing staff tended to surgery-related wounds on SM's legs, but their chart notes did not reflect whether they regularly checked the incision on SM's sternum.

Several days after SM arrived, Gates personally observed that SM's sternum incision was "red and angry" but Gates did not chart this observation, alert SM's surgeon, or discuss the inflammation with SM's attending nurse. Verbatim Report of Proceedings (VRP) (Feb. 19, 2019) at 296. Gates did not further investigate the cause of the redness or otherwise follow up. About four days later, SM's sternum incision was so infected that it split open, requiring her to be readmitted to the hospital for further surgery and intravenous antibiotics.

Adult Protective Services (APS) investigated Fidalgo and found that Gates had neglected SM. An administrative law judge (ALJ), Department of Social and Health Services (Department) Board of Appeals (Board) review judge, and superior court affirmed the neglect finding.

Gates argues the Board review judge applied the incorrect statutory standard for neglect, the finding of neglect was not supported by substantial evidence, and the finding was arbitrary and capricious. We disagree and affirm.

FACTS

I. SM'S SURGERY AND STAY AT FIDALGO

Gates began working at Fidalgo as Director of Nursing Services in February 2018. Before starting at Fidalgo, she was a direct care nurse and an assistant Director of Nursing Services at a different facility. Her duties at Fidalgo included, "[R]esponsibility and accountability for the functions and activities of the nursing staff" and she was "[r]esponsible for the provision of resident care according to facility philosophy and standard nursing practice and consistent with Federal and State regulations." Certified Agency Record (AR) at 122. During the relevant time period, Fidalgo had 44 patient beds and approximately 33 other patients.

SM was a 70-year-old woman who was admitted to Fidalgo in June 2018 after open-heart surgery. Veins had been harvested from her legs to reroute blood around blocked veins in her heart. SM had type 2 diabetes that was difficult to manage; a history of breast cancer that resulted in radiation, chemotherapy, and a mastectomy; and a history of heart problems. Due to postoperative complications, SM had an extended hospital stay before being admitted to Fidalgo.

When SM arrived at Fidalgo, she had wounds on her legs where her veins had been harvested and a surgical incision on her sternum that was sealed with medical glue. Her sternum wound was stable and healing well when she left the hospital.

Fidalgo had never cared for a patient who had undergone a complex open-heart surgery before. SM's transfer notes included her history of medical problems. The notes also included instructions to weigh her daily and notify the surgeon if her weight increased by three pounds in one day, or five pounds within five days. The transfer notes contained wound care orders directed at the harvest sites on SM's legs and feet. There were no wound care orders specifically referencing the sternum incision, but one order read, "[Patient] may shower with assistance. If not showering daily, all surgical site wounds are to be cleaned with wound cleaner and new dressings placed. Please notify Dr. [William] Reed [SM's heart surgeon] if signs of infection develop." AR at 317.

The initial nursing assessment performed at Fidalgo noted that SM's reason for admission was "'[h]eart surgery.'" AR at 323. The assessment also identified the surgical incision on SM's chest, in addition to several incisions and blisters on her feet and legs. And the assessment contained her history of diabetes. A "Skin Observation Tool" also referred to the sternum incision, reading, "Surgical incision on chest is well approximated and stitches intact with no [signs of] irritation or redness. Left [open to air]." AR at 337.

During her stay at Fidalgo, nursing and wound care staff took extensive notes on SM's feet and leg wounds. The Fidalgo staff's chart notes made no specific mention of treatment or care for SM's chest wound.

Because of the placement of the sternum incision, SM was not able to monitor it herself. Her surgeon did not expect SM to be the one who cared for the incision. A few days after SM

arrived at Fidalgo, a wound care specialist examined SM's leg and foot wounds, but with regard to the sternum wound, the specialist's report said only that, according to "information . . . obtained from the patient," the wound was "without signs of infection." AR at 338. This is consistent with what SM reported. She claimed that for over 10 days at Fidalgo, staff only glanced at her sternum incision and no doctor examined it. The staff at Fidalgo appeared to believe that SM was supposed to be cleaning and caring for the wound herself, in direct contradiction to the surgeon's orders.

Approximately seven days into SM's stay at Fidalgo, and either the day after or on the same day of the wound care specialist's examination, Gates had an opportunity to talk with SM and a nurse. Gates observed that the sternum wound was "red and angry," and "'still healing but not as well.'" VRP at 296; AR at 233. Gates later explained that the incision "had no signs and symptoms of infection but rather appeared to be angry with the bra use at the inferior sternal end," and she believed that the prosthetic portion of the bra "was rubbing the wound end and didn't support the open to air orders." AR at 190. Gates did not document her observation, perform a root cause analysis, or discuss the redness with the attending nurse who would have been responsible for charting the redness.

In addition, during her stay at Fidalgo, SM's weight increased by five pounds in one day and an additional two pounds over the next three days. There is no evidence that anyone at Fidalgo notified her surgeon of the sudden weight gain as required on her transfer orders.

Ten days into SM's stay, Fidalgo's Medical Director, Dr. Nancy Llewellyn, examined SM for the first time and observed that the sternum wound had dehisced, or split open. Dr. Llewellyn immediately called Dr. Reed and had SM readmitted to the hospital. Upon readmission to the

hospital, SM needed extensive debridement of the wound to remove infected tissue and several weeks of antibiotics. The infection significantly set back her recovery.

Dr. Reed was alarmed when he learned that no doctor had observed the sternum incision for 10 days. He stated that he did not believe that SM's bra could have caused the dehiscement. Dr. Reed opined that the care SM received at Fidalgo was "'unusually neglectful'" and he emphasized that the wound "'literally fell apart.'" AR at 236. He also noted that he had sent Fidalgo "specific orders for a glucose control program" for SM's diabetes that were not followed. AR at 407.

## II. INVESTIGATION

The hospital reported Fidalgo to APS, alleging neglect of SM based on the failure to clean her sternum wound. William Hayward, a social worker and APS investigator, was the primary investigator. Hayward interviewed SM and a Fidalgo administrator in person and conferred several times with Residential Care Services, another division of the Department investigating Fidalgo at the same time.

Residential Care Services identified Gates and Dr. Llewellyn as possible perpetrators of the neglect of SM. Hayward then determined that Dr. Llewellyn was not a likely perpetrator of SM's neglect because she became involved with SM's care too late to have prevented the dehiscement. Jim Riccardi, an APS field office supervisor, interviewed Gates in person, and Hayward interviewed Gates via e-mail.

During Hayward's investigation, Gates acknowledged the admitting nurse's failure to "enter wound care cleansing orders for all wounds" and a second nurse's failure to capture upon review the "missed wound care cleansing order." AR at 190. Gates also admitted that nurses "failed

to notify [SM's] physician of weight gain greater than 3 pounds." *Id.* Gates asserted that SM's "admission orders did not contain orders to monitor" the sternum wound, but she also said that the admitting nurse was "new to the position and did not enter monitoring of the [sternum site] to the plan of care." AR at 293. Gates also admitted that the facility procedures required a doctor "or equivalent" to see a new patient "within 72 hours" of admission. *Id.* She stated that nurses at Fidalgo monitored care plans to ensure they were being implemented correctly "and then review[ed] with [the Director of Nursing Services] for oversight purposes and to make any needed changes." AR at 294.

In August 2018, APS determined that Gates had neglected a vulnerable adult as defined in former RCW 74.34.020(16) (2018). Neglect occurs under the relevant statute when a person with a duty of care (1) engages in a pattern of conduct or inaction that fails to provide a vulnerable adult with goods and services that maintain physical or mental health, or (2) when a single act or omission creates a clear and present danger to the vulnerable adult's health, welfare, and safety. *Id.* Gates requested a hearing before an ALJ.

### III. NEGLECT HEARING

The ALJ reviewed evidence and heard testimony consistent with the above facts. Gates admitted that SM was a vulnerable adult while she was a resident at Fidalgo and that "as the director of nursing services at a skilled nursing facility" Gates had a duty of care that extended to SM. Gates contested whether, as Director of Nursing Services, she was accountable for the neglect of other nurses and whether neglect had occurred at all.

The Department presented testimony that SM was a complicated, high-risk patient who arrived at Fidalgo with a properly-healing sternum incision and instructions to clean her wounds

if she was not showering daily; that she did not shower daily; and that Fidalgo nurses and staff never cleaned her sternum wound. The Fidalgo administrator testified that he and the Director of Nursing Services were ultimately responsible for "making sure patients in the facility receive prompt and adequate care." VRP at 38. The Director of Nursing Services was also responsible for making sure that physicians' orders were followed. When the Director of Nursing Services noticed a change in a patient's status, they were expected to document the observation and notify the patient's doctor.

Tina Willet, a nurse consultant Fidalgo hired after the APS investigation was opened, initially opined that no neglect had occurred. But she also testified that a nurse's observation of a red wound should trigger an assessment. Willet stated that she did not know during her investigation that SM was the facility's first complex cardiac patient. She testified that had she known, she would have more rigorously examined Fidalgo's policies and procedures. Willet acknowledged SM's history of diabetes, radiation treatment, and postoperative complications put her at high risk for dehiscement. Willet also testified that SM's bra was unlikely to have caused the dehiscement and would probably have reduced her risk of dehiscement versus not wearing a bra. And Willet admitted that if no staff member removed SM's shirt to examine the wound until 10 days into SM's stay, that would not be the course of care that Fidalgo was instructed to provide SM.

Willet testified the sternum wound should have been closed and healed when SM arrived at Fidalgo and wounds can dehisce with little to no warning. And Gates argued that SM's diabetes was well managed during her stay at Fidalgo. However, Gates testified that she did not directly

7

review admitting records for accuracy and that she relied on Fidalgo's staff and systems to make her aware of issues regarding patient care.

Gates explained that she would not document her interactions with a patient unless she was "doing a hands-on treatment, and doing care." VRP at 315. She testified that she would expect her staff to document interactions where she assisted. And she testified that when she observed the redness of SM's incision, she would have expected the attending nurse to document the change. Gates admitted that she did not discuss the redness with the other nurse who was present when she observed it. Gates also confirmed that she did not document or otherwise draw attention to the redness of the sternum incision.

## IV. ALJ RULING AND APPEALS

The ALJ entered an initial order with extensive findings of fact and conclusions of law in April 2019. The ALJ concluded that SM was a vulnerable adult under former RCW 74.34.030(22) (2018) and that Gates had a duty of care to her as an employee of a licensed skilled nursing facility. The ALJ concluded Gates neglected SM under both the pattern of conduct prong and act or omission prong of former RCW 74.34.020(16).

The ALJ found a pattern of conduct because Gates was responsible for multiple nurses who failed to document or care for SM's sternal incision over the course of several days. Gates did not follow up on the nurses' failures, even though her job was to ensure that the physician's orders were followed. Thus, the ALJ concluded that Gates "failed in her capacity of [Director of Nursing Services] to ensure that [SM] was provided the care that was required to maintain [SM]'s physical or mental health, in accordance with the standard care of nursing practice that is consistent with Federal and State regulations." AR at 69-70.

The ALJ based the act or omission conclusion on Gates's failure to document or otherwise follow up on her own observation of SM's "'red and angry'" sternal incision. AR at 70. The ALJ concluded that in light of SM's assorted comorbidities and risk factors, the failure to follow up on the observation of the "'red and angry'" wound demonstrated a serious disregard of consequences. *Id.* And the ALJ concluded that the disregard was of such a magnitude to constitute a clear and present danger to SM's health, especially because SM had to be rehospitalized for an additional surgery due to the wound's infection.

Gates sought review of the ALJ's decision, and in October 2019, the Board review judge issued a review decision and final order that were based on the record before the ALJ. The Board review judge found that SM had a wound on her sternum when she entered Fidalgo, and she had "various medical problems" noted in her transfer orders that made her at high risk for unsuccessful wound healing. AR at 3. The Board review judge also found that Gates and her staff did not comply with instructions in the transfer orders or properly attend to SM's sternum wound and that SM had to be readmitted to the hospital when the wound opened due to infection. The Board review judge further found that Fidalgo failed to follow instructions in the transfer orders to contact SM's surgeon when she experienced rapid weight gain.

The Board review judge concluded that SM was a vulnerable adult and that Gates had a duty of care toward her. The Board review judge concluded Gates neglected SM through a "pattern of conduct and *inaction*" because her job description stated she was "'responsible for the provision of resident care according to facility philosophy and standard nursing practice.'" AR at 25 (emphasis added). The Board review judge summarized the most pertinent factual findings supporting the conclusion that Gates neglected SM:

Appellant admitted to the shortcomings of her staff in not correctly or thoroughly charting the transfer orders for [SM], and under her job description she was accountable and liable for those shortcomings. [Fidalgo's] own progress notes concerning [SM] do mention the [heart surgery], but never mention any attention being paid to the sternum. This lack of attention was completely consistent with what [SM] herself had said: for over 10 days no doctor looked at her sternum and the staff only glanced at it. Appellant also had her own opportunity on June 21, 2018, to intervene when she saw [SM]'s red and angry wound was "not healing as well" as it had been, but she did nothing. . . . Finally, Appellant's own witness testified that [SM]'s wound was at high risk of failing given her mastectomy and her diabetes, and both of these complicating factors were in the medical records for Appellant and her staff to see, but they were disregarded, as was the wound.

Appellant's failure to act was both her failure to supervise and monitor her nursing staff's care of [SM], but also her own failure to act when she observed the sternal wound on June 21, 2018, and said it was red and angry and not healing "as well" as before.

AR at 26. The Board review judge concluded that the Director of Nursing Services position placed liability for the "'functions and activities of the nursing staff'" on Gates's shoulders. AR at 26. And attention to a surgical wound after a complex heart surgery was a "'good or service'" maintaining physical or mental health that a patient would expect upon admission to a skilled nursing facility. AR at 27.

The Board review judge further held that Gates neglected SM first through her "failure to identify the admitting nurse's oversights in assessing [SM] as she was admitted to [Fidalgo]" and second when Gates observed that SM's sternal incision was "not 'healing as well'" but did nothing to document or remedy the issue, despite SM's high-risk factors. AR at 28. "This serious disregard was beyond 'mere negligence'" and constituted a clear and present danger to SM's health due to SM's history of cancer and diabetes, the serious nature of her surgery, and the fact that she was Fidalgo's first complex cardiac surgery resident, as testified to by Gates's own expert witness. AR

at 29. The Board review judge also recognized that the failure to report SM's rapid weight gain to her surgeon created a clear and present danger to SM's health.

The Board review judge ultimately concluded that Gates neglected SM through both a pattern of conduct and a single act or omission. The final decision and order stated, "The failure to attend to the sternal incision wound failed to provide [SM] with the goods and services she was in [Fidalgo] to receive and the failure to attend to the wound created a clear and present danger to [SM]'s health, welfare, and safety," and thereby "constitut[ed] 'neglect' under both [former] (16)(a) and (16)(b) of . . . [former] RCW 74.34.020(16)." AR at 31.

Gates petitioned for judicial review. The superior court affirmed the Board review judge's findings of fact and conclusions of law. Gates appeals.

ANALYSIS

The Administrative Procedure Act, chapter 34.05 RCW, governs judicial review of final agency actions. "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a). Gates argues three of the available grounds for invalidating the Board review judge's decision—the Board review judge erroneously interpreted or applied the law, the finding of neglect was not supported by substantial evidence, and the neglect finding was arbitrary and capricious. RCW 34.05.570(3). We disagree.

I. DEFINITION OF "NEGLECT"

Gates argues the Board review judge erred by stating that Gates "and her staff's inattention to [SM]'s sternal wound failed to provide[SM] with goods and services to protect her health and created a clear and present danger to her health, welfare, and safety." Appellant's Opening Br. at 16. Gates contends that "neglect" under chapter 74.34 RCW "is not mere negligence." *Id.* at 14.

The Department argues the Board review judge correctly applied the standard of neglect in former RCW 74.34.020(16). We agree with the Department.

This court recently held that the appropriate standard for neglect of a vulnerable adult is the definition of "neglect" in former RCW 74.34.020(16). *Woldemicael v. Dep't of Soc. & Health Servs.*, 19 Wn. App. 2d 178, 181, 494 P.3d 1100 (2021). Former RCW 74.34.020(16) defines "neglect" as:

> (a) [A] pattern of conduct or inaction by a person or entity with a duty of care that fails to provide the goods and services that maintain physical or mental health of a vulnerable adult, or that fails to avoid or prevent physical or mental harm or pain to a vulnerable adult; or (b) an act or omission by a person or entity with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety.

The Board review judge's final order recited the language of former RCW 74.34.020(16) and noted the distinctions between the two subsections. The Board review judge also discussed the definitions of each element of each subsection. The conclusions of law explained how Gates committed neglect under both the pattern subsection and the single act or omission subsection. Furthermore, the order stated that Gates's "failure to attend to the sternal incision wound failed to provide [SM] with the goods and services she was in [Fidalgo] to receive and . . . created a clear and present danger to [SM]'s health, welfare, and safety, thus constituting 'neglect' under both [former] (16)(a) and (16)(b) of . . . [former] RCW 74.34.020(16)." AR at 31.

While we agree with Gates that serious disregard requires more than simple negligence, neither the ALJ nor the Board review judge ever suggested that ordinary negligence supported the neglect findings. Rather, the Board review judge quoted the statutory language and held that Gates's actions constituted both a pattern of conduct that failed to provide the goods and services

that maintained SM's physical and mental health and demonstrated a serious disregard of consequences of such a magnitude as to create a clear and present danger to SM's health, welfare, or safety.

We conclude that the Board review judge used the correct definition of "neglect" and properly applied the law.

## II. SUBSTANTIAL EVIDENCE FOR FINDING OF NEGLECT

Gates argues that the Board review judge's overall finding of neglect was not supported by substantial evidence in the record and that the investigator failed to follow prescribed procedures. Gates focuses on testimony and evidence she claims is contradictory to the Board review judge's findings, contending that Gates "did not have direct care responsibility for individual clients," SM's chest wound had healed by the time she was admitted to Fidalgo so there was no wound to monitor, nevertheless her sternum surgical site was still "observed and monitored," and the wound dehiscing was the sudden eruption of a deep surgical wound infection. Appellant's Opening Br. at 5-6. But Gates fails to specifically assign error to any of the Board review judge's underlying findings of fact. And we disagree with her assessment of the overall neglect finding.

The Department argues that the neglect finding was based on "medical records obtained from the hospital that performed [SM]'s surgery, from Fidalgo, and from [Residential Care Services]; interviews APS and [Residential Care Services] conducted with Ms. Gates, [SM], [SM]'s surgeon, and the doctor on staff at Fidalgo; and testimony of numerous individuals at [the] hearing," constituting substantial evidence. Resp't's Br. at 25.

We review the Board review judge's factual findings for substantial evidence in light of the whole record, including the administrative record. RCW 34.05.570(3)(e). To assess whether

substantial evidence supports a challenged factual finding, we ask "whether the record contains evidence sufficient to convince a rational, fair-minded person that the finding is true." *Pac. Coast Shredding, L.L.C. v. Port of Vancouver, USA*, 14 Wn. App. 2d 484, 501, 471 P.3d 934 (2020). "We do not reweigh evidence or judge witness credibility but, instead, defer to the agency's broad discretion in weighing the evidence." *Whidbey Envtl. Action Network v. Growth Mgmt. Hr'gs Bd.*, 14 Wn. App. 2d 514, 526, 471 P.3d 960 (2020). Even if there is conflicting evidence, we will not disturb findings of fact that are supported by substantial evidence. *McCleary v. State*, 173 Wn.2d 477, 514, 269 P.3d 227 (2012).

A.    Specific Factual Findings

Although Gates argues facts that contradict the Board review judge's findings, she failed to challenge specific underlying findings in her petition for judicial review, nor has she assigned error in this appeal to any of the enumerated findings of fact.

RAP 10.3(g) provides, "A separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number." This court has held that the failure to properly assign error to an administrative agency's findings in accordance with RAP 10.3 means that we will treat the unchallenged findings as verities on appeal and limit our review to whether the findings support the conclusions of law. *Fuller v. Emp't Sec. Dep't*, 52 Wn. App. 603, 606, 762 P.2d 367 (1988).

Gates fails to challenge enumerated findings in the Board review judge's decision. To the extent that Gates's version of the facts contradicts the Board review judge's underlying findings, the findings are supported by evidence in the record. *See* AR 122-25 (Director of Nursing Services job description), 170-73 (Fidalgo progress notes, which identify several dressing changes on SM's

14

feet and legs but do not refer to her sternum between June 15, 2018 and June 25, 2018, when SM was discharged for rehospitalization), 188-89 (Willet's review of SM's care, noting inaccurate documentation), 309 (discharge notes from hospital for admission to Fidalgo stating sternum wound was "healing well" and "stable" at that time); VRP at 151-52 (Hayward's testimony that consultation with multiple doctors supported his belief that the dehiscement resulted from an external infection), 278-79 (Willet's testimony acknowledging that SM's comorbidities would make wound healing difficult and put her at high risk for dehiscement).

Because Gates fails to assign error to specific findings, we focus on whether there is substantial evidence supporting the ultimate finding of neglect. We first address the portion of the "neglect" definition that applies to Gates's direct interactions with and responsibility for SM, former RCW 74.34.020(16)(b).

## B. Act or Omission Prong

To find neglect under former RCW 74.34.020(16)(b), the Department had to prove (1) a person or entity with a duty of care (2) to a vulnerable adult (3) committed an act or omission (4) demonstrating a serious disregard of consequences (5) of such a magnitude to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety. Gates did not contest at the initial hearing that SM was a vulnerable adult and that Gates had a duty of care to SM.

For the single act or omission, the Board review judge relied on Gates's "failure to identify the admitting nurse's oversights in assessing [SM] . . . and [Gates's] own checking of [SM]'s sternal incision wound . . . seeing that it was not 'healing as well,' but doing nothing." AR at 28. The Board review judge rejected Gates's characterization that Gates "was not the cause of the deterioration of the wound and that perhaps [the dehiscement] was inevitable." AR at 28.

15

The Board review judge relied on Dr. Reed's comment that "'unusually neglectful care'" allowed the dehiscement and "that it was 'neglectful for no one to check this wound.'" *Id.* The Board review judge also relied on Willet's testimony to conclude that Gates's conduct exceeded "'mere negligence'" to constitute "serious disregard of [SM]'s health, welfare, and safety" due to SM's comorbidities and the fact that she was Fidalgo's first complex cardiac surgery resident. AR at 29. The Board review judge concluded that the disregard constituted a clear and present danger to SM's health, "proved by the documented disregard of the wound on a patient so medically complicated and risky," not just by SM's rehospitalization. *Id.* The Board review judge made this finding even though the Board review judge acknowledged that a wound care specialist noted, according to "information obtained from the patient," the wound was "without signs of infection," AR at 338, shortly before Gates observed the wound as "'red and angry,'" AR at 7.

In addition, the Board review judge found based on Gates's own testimony that the surgeon's instructions requiring Fidalgo to alert him to sudden weight gain were not followed. The Board review judge found that SM arrived at Fidalgo with orders mandating that she be weighed daily and instructions to notify SM's surgeon if her weight increased by three pounds in one day or five pounds over five days. The Board review judge found that SM gained five pounds in three days, and seven pounds overall during her stay at Fidalgo, "but nothing in the medical record indicated [Fidalgo] notified her surgeon of the weight gain." AR at 5. The Board review judge found that Gates discovered the weight gain and her nurses' failure to notify SM's surgeon during her root cause analysis of Gates's surgical wound. The Board review judge concluded that "ignoring rapid weight gain of a complicated post-cardiac surgery patient with diabetes and failing

16

to contact her heart surgeon about the weight gain as the surgeon had requested also created a clear and present danger to [SM]'s health." AR at 30.

We do not reweigh evidence or judge witness credibility; such matters are left to the discretion of the review judge. *Whidbey Envtl. Action Network*, 14 Wn. App. 2d at 526. Even disputed evidence is substantial if it is sufficient to persuade a reasonable person of its truth. *McCleary*, 173 Wn.2d at 514. The evidence here—much of it undisputed or provided by Gates— is sufficient to persuade a reasonable person that Gates demonstrated a serious disregard of consequences of such magnitude to constitute a clear and present danger to SM's health, welfare, or safety. Former RCW 74.34.020(16)(b); *McCleary*, 173 Wn.2d at 514.

Gates argues that she was a scapegoat of a lax investigation. But medical records and Gates's own admissions support the Board review judge's conclusion, and we do not reweigh evidence or judge witness credibility, especially when the appellant has not challenged specific findings. *Whidbey Envtl. Action Network*, 14 Wn. App. 2d at 526. Significantly, Gates admitted that she observed a "red and angry" surgical incision, but she failed to ensure that someone followed up. VRP at 296. This admission alone is sufficient to overcome Gates's argument that she was a scapegoat.

C.      Pattern of Conduct or Inaction Prong

To find neglect under former RCW 74.34.020(16)(a), the Department had to prove (1) a person or entity with a duty of care (2) to a vulnerable adult (3) engaged in a pattern of conduct or inaction (4) that failed to provide goods or services to maintain the adult's physical or mental health, or that failed to prevent physical or mental harm to the adult.

The Board review judge concluded that Gates's job description included, "'[A]ccountability for the functions and activities of the nursing staff,'" and that she admitted at least three of her employees were deficient in their care of SM because they failed to accurately chart and follow SM's doctor's orders. AR at 225. Fidalgo had about 33 residents that Gates was ultimately responsible for at that time, not such a large number that Gates could not take steps to ensure that SM's doctor's orders were followed, especially where Fidalgo had never cared for a patient who had undergone a complex open-heart surgery before.

The Board review judge highlighted that Willet, Gates's own expert witness, testified that SM was high-risk because of her diabetes and history of cancer and radiation. The Board review judge also referenced Fidalgo's progress notes, which were consistent with SM's statements that "for over 10 days no doctor looked at her sternum and the staff only glanced at it." AR at 26.

The Board review judge determined that care for a surgical incision constituted a good or service that a patient would expect at a skilled nursing facility after complex heart surgery and that the lack of care resulted in a second hospitalization. Thus, the Board review judge found that Gates's duty to oversee her staff, coupled with the failures of multiple members of that staff over the course of 10 days, including Gates's own failure to document or react to the "red and angry wound," constituted a pattern of conduct and inaction failing to provide "'the goods and services that maintain [the] physical or mental health of a vulnerable adult.'" AR at 26-27.

The Board review judge emphasized that the key findings of fact were based on uncontested medical records, as well as Gates's own testimony and the testimony of her expert witness. *See McCleary*, 173 Wn.2d at 514; *Whidbey Envtl. Action Network*, 14 Wn. App. 2d at 526. This evidence would convince a rational, fair-minded person that Gates engaged in a pattern

of conduct or inaction that failed to provide goods or services to maintain SM's physical or mental health under former RCW 74.34.020(16)(a).

In sum, there is substantial evidence in the record to support the Board review judge's findings and conclusion that Gates neglected SM through both a pattern of conduct or inaction, and an act or omission.

### III. ARBITRARY AND CAPRICIOUS REVIEW

Gates also argues that the Board review judge's finding of neglect was arbitrary and capricious. We disagree.

To be arbitrary and capricious, an agency action must be "willful and unreasoning action, without consideration and in disregard of facts and circumstances. Where there is room for two opinions, action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached." *State v. Rowe*, 93 Wn.2d 277, 284, 609 P.2d 1348 (1980) (citations omitted).

Gates argues the neglect finding is arbitrary and capricious due to "uncontradicted expert testimony" from Willet regarding the nature of SM's dehiscing infection. Appellant's Opening Br. at 23. In fact, Willet's testimony highlighted several issues with procedures at Fidalgo. She acknowledged that SM was high risk because of her cancer history and diabetes. She said that seeing a red wound should trigger an assessment to determine the cause. She said that SM's bra was an unlikely source of the redness or dehiscement and that, to the contrary, it would have lowered the risk of dehiscement. She said that in hindsight she would have examined policies and procedures more rigorously had she known that SM was the facility's first complex cardiac patient. She also acknowledged that complete failure to give the sternum incision due consideration for 10

No. 55311-2-II

days would not be the correct course of care. Thus, the Board review judge's finding was not "willful and unreasoning" or "without consideration and in disregard of facts and circumstances." *Rowe*, 93 Wn.2d at 284.

We hold that the Board review judge's finding of neglect was not arbitrary and capricious.

CONCLUSION

We affirm the Board review judge's and superior court's orders.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

I concur:

Lee, C.J.

MAXA, J. (dissenting) – I disagree that Gates was guilty of "neglect" under either subsection of former RCW 74.34.020(16) (2018). Therefore, I dissent.

Regarding the pattern of conduct prong, former RCW 74.34.020(16)(a), the Board review judge found Gates responsible for her staff's inattention to SM's sternal incision. However, the transfer care order from SM's doctor included a wound care order that referenced wounds only on her legs, knees, feet and toes, and did not mention the sternal incision. The admitting nurse may have made a mistake in not realizing that SM's sternal incision also needed care despite her doctor not ordering such care. And that mistake may have resulted in SM not receiving appropriate care for her sternum incision. But that mistake hardly constituted "neglect" that should attributed to the Director of Nursing Services.

Regarding the act or omission prong, former RCW 74.34.020(16)(b), the Board review judge found Gates responsible for her failure to identify the admitting nurse's mistake and for not reporting that on June 21 she noticed that the sternal incision was red and angry and not healing as well. On the first ground, it simply cannot be the law that a Director of Nursing Services in a facility serving 33 patients can be found guilty of neglect for failing to discover an admitting nurse's mistake.

On the second ground, there was no showing that Gates's failure to mention the incision redness "demonstrate[d] a serious disregard of the consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety." Former RCW 74.34.020(16)(b). There is no indication in the record that what Gates observed should have alerted her that there was a clear and present danger to SM's health. It is significant that on

that same date, a wound care specialist who fully examined SM did not even mention the sternal incision.

_____
Maxa, J.